### UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

KURT SPRENGLE,

              Plaintiff,

v.                                  Case No.   3:20-cv-1348-MMH-LLL

SMITH MARITIME INC. and BOA
BARGES LLC,

              Defendants.

_____

## <u>ORDER</u>

**THIS CAUSE** is before the Court on Defendant Smith Maritime Inc.'s (SMI) Motion to Dismiss Counts IV, V, and VI of the Third Amended Complaint. (Doc. 64; Motion). Plaintiff Kurt Sprengle filed his Response in Opposition to Defendant SMI's Motion to Dismiss Counts IV, V, and VI of the Third Amended Complaint. (Doc. 73; Response). Accordingly, this matter is ripe for review. For the reasons below, SMI's Motion will be denied.

## I.   Background[1]

SMI owns and operates a tugboat fleet that transports goods between the United States and Latin America. (Doc. 61; Third Amended Compl.) ¶ 9. For more than a decade, Plaintiff Kurt Sprengle worked as a seaman aboard SMI's tugboats. Id. ¶ 11. On January 26, 2019, Sprengle was working aboard a tugboat owned by SMI—the Elsbeth II—that was tasked with delivering an empty barge owned by BOA Barges LLC (the BOA Barge) to Columbia. Id. ¶¶ 10, 13. While attempting to connect the Elsbeth II with the BOA Barge, Sprengle suffered severe injuries. Id. ¶¶ 15–22. Those injuries give rise to this lawsuit.

### A. Making Up Tow

Sprengle was injured while trying to connect the Elsbeth II with the BOA Barge, a process called "making up tow." Id. ¶ 15. The process begins with a pennant chain—a ninety-foot chain whose individual links weigh more than eighty pounds each. Id. ¶¶ 15–17. One end of the pennant chain is secured to the barge via a bridle chain (a V-shaped chain attached to the port and

---

[1]   In considering SMI's Motion, the Court must accept all factual allegations in the Third Amended Complaint as true and construe all ambiguities in favor of Sprengle. Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990). As such, the facts recited here are drawn from the Third Amended Complaint and may well differ from those that ultimately can be proved.

starboard sides of the barge). <u>Id.</u> ¶ 15. The other end of the pennant chain is secured to a towline that sits aboard the tugboat. <u>Id.</u>

Sprengle was injured while trying to secure the pennant chain to the <u>Elsbeth II</u>'s towline. <u>Id.</u> ¶¶ 20–21. To attach the pennant chain to the towline, the tugboat crew must lift part of the chain aboard the tugboat. <u>Id.</u> ¶ 16. This task requires a "pickup line"—a rope that allows the crew to lift and maneuver the pennant chain. <u>Id.</u> ¶ 15. The barge crew ties one end of the pickup line to the pennant chain, then tosses the other end of the pickup line to the tugboat crew, who wrap it around a "cathead" (essentially, a spool) located aboard the tugboat. <u>Id.</u> ¶¶ 15–16, 18. The tugboat captain then turns the cathead while a crew member spools the pickup line around the cathead. <u>Id.</u> ¶ 16. Once part of the pennant chain is hauled aboard the tugboat's deck, the crew connects it to the towline. <u>Id.</u>

## B. The Incident

On the day he was injured, Sprengle's job was to spool the pickup line around a cathead on the deck of the <u>Elsbeth II</u>. <u>Id.</u> ¶ 20. Assisting him in his endeavors were two men—Latham Smith, captain of the <u>Elsbeth II</u>, and an unnamed crew member acting as the "first mate." <u>Id.</u> ¶ 17. Captain Smith stood immediately above Sprengle and operated the cathead, while the first mate assisted Sprengle and oversaw the process. <u>Id.</u>

The process began when two BOA crew members standing aboard the barge heaved the pickup line across the water to the <u>Elsbeth II</u> crew. <u>Id.</u> ¶ 18. When Sprengle and the first mate received the line, they saw that it was worn, frayed, and thin. <u>Id.</u> Insisting that the pickup line was unsafe, the men threw it back to the BOA crew. <u>Id.</u> ¶¶ 18–19. But the BOA crew refused to substitute the pickup line. <u>Id.</u> Instead, they threw it back across the water, claiming it was "the one we used all the time." <u>Id.</u> ¶ 18. At this point, neither the first mate nor Captain Smith intervened; therefore, Sprengle alleges that he had no choice but to use the line. <u>Id.</u> ¶ 20.

Sprengle proceeded with his job—he spooled the pickup line around the cathead as it lifted the pennant chain towards the <u>Elsbeth II</u>'s deck. <u>Id.</u> ¶¶ 20–21. Before the pennant chain reached the deck, however, the pickup line parted and struck Sprengle across his face. <u>Id.</u> ¶ 21. Sprengle suffered severe injuries: the pickup line fractured bones in his face, pulverized his nose, damaged his eye, destroyed his teeth, and knocked him unconscious <u>Id.</u> ¶¶ 21–22. A helicopter airlifted Sprengle to a Baton Rouge hospital, where he remained for ten days. <u>Id.</u> ¶ 21.

### C. Sprengle's Claims

In this action, Sprengle sues SMI and BOA Barges LLC for damages resulting from his injuries.[2] <u>See generally</u> Complaint and Demand for Jury Trial (Doc. 1). Though he brings numerous claims against both Defendants, just three of his claims against SMI—Counts IV, V, and VI—are the subject of the Motion.   The Court summarizes those claims below.

In Count IV, Sprengle sues SMI for Unseaworthiness (Unseaworthiness Claim). <u>See</u> Third Amended Compl. ¶¶ 50–57. Sprengle contends that the <u>Elsbeth II</u> was unseaworthy because the pickup line was not reasonably fit for its intended use. <u>Id.</u> ¶ 55. Sprengle also rests his Unseaworthiness Claim on Captain Smith's order to use the pickup line and his failure to warn Sprengle

---

[2] Sprengle initially sued SMI and a number of BOA-related entities on November 30, 2020. <u>See generally</u> Complaint and Demand for Jury Trial (Doc. 1). Months later, Sprengle dismissed the BOA-related entities and amended the Complaint to name BOA and SMI as the sole defendants. <u>See</u> Amended Complaint and Demand for Jury Trial (Doc. 7); <u>see also</u> (Doc. 21) at 4. In his Amended Complaint, Sprengle asserted three negligence-based claims against SMI—one under the Jones Act and two under maritime law. <u>See</u> Amended Complaint and Demand for Jury Trial (Doc. 7) ¶¶ 29–40, 48–53. Later, Sprengle filed a Second Amended Complaint that dropped both maritime negligence claims against SMI, but maintained the Jones Act negligence claim. <u>See</u> Plaintiff's Unopposed Motion for Leave to Amend the First Amended Complaint (Doc. 21) at 9–11, 12–13. On March 18, 2022, the Court granted Sprengle leave to file a third amended complaint. <u>See</u> Order Requiring Supplemental Briefing on Motion to Compel and Granting Motion to Amend (Doc. 59) at 5. In his Third Amended Complaint, Sprengle has added three additional claims against SMI—(1) unseaworthiness, (2) retaliatory discharge, and (3) maintenance and cure. <u>See</u> Third Amended Compl. ¶¶ 50–67. SMI now asks the Court to dismiss these three new claims. <u>See generally</u> Motion.

about the dangerous condition. <u>Id.</u> ¶¶ 18, 20, 53; <u>see also</u> Response at 11. To support this aspect of his claim, Sprengle points to a letter Captain Smith penned to BOA after the incident:

> The previous day on my routine inspection of the tow, <u>I had called attention to the small size of the pickup line for the bridles</u>. Your man with me said it was special rope, and that it was to be used only to swing the chain pigtail to the tug, and the weight of the chain would be held up by the winch on top on the house forward. This was not done, and the line was tossed over to the tug. The bridle chains were in the mud which made it even more difficult to connect.

<u>See</u> Third Amended Compl. ¶ 23. This letter, according to Sprengle, shows that Captain Smith inspected the pickup line the day before the incident and found it too small. <u>Id.</u> Despite this knowledge, Sprengle alleges that Captain Smith did nothing to protect him. <u>Id.</u> ¶¶ 20, 23–24. As a result, he brings a claim for unseaworthiness in Count IV.

In Count V, Sprengle sues SMI for retaliatory discharge (Retaliatory Discharge Claim). <u>Id.</u> ¶¶ 58–61. Sprengle alleges that on November 30, 2020, SMI terminated his employment. <u>Id.</u> ¶ 59. According to Sprengle, more than a month before his termination, SMI's former counsel wrote the following letter to BOA's insurer:

> Smith Maritime has had a very good relationship with Sprengle. He is considered a hard worker and was considered a valued employee. In fact, <u>if there was no claim</u> and the plaintiff was released to return to work, Smith Maritime would hire him in a second. <u>However, unless [Plaintiff] would agree to drop his claim</u>

> against Smith Maritime, the chances of his return to employment
> for Smith Maritime is nil.

Id. ¶ 28. Sprengle points to this letter as proof that SMI terminated him for refusing to drop his personal injury claim. Id. ¶ 59. Therefore, Sprengle brings a claim for retaliatory discharge in Count V.

Third, in Count VI, Sprengle sues SMI for failure to provide maintenance and cure (Maintenance and Cure Claim). Id. ¶¶ 62–67. Sprengle says that the pickup line inflicted physical and psychological injuries, for which SMI initially provided medications and psychological treatment. Id. ¶¶ 22, 29, 65. But when Sprengle requested additional psychological treatment in November 2021, SMI denied his request. Id. ¶¶ 29, 65–66. This denial, according to Sprengle, was a breach of SMI's duty to provide maintenance and cure. Id. ¶¶ 62–67. For that reason, he brings a claim for maintenance and cure in Count VI.

### D. SMI's Motion

SMI asks the Court to dismiss Counts IV, V, and VI. See generally Motion. As to the Unseaworthiness Claim, SMI argues that it had no duty to provide a seaworthy pickup line, nor could it foresee that the line would be misused. Id. at 3–5. With respect to the Retaliatory Discharge Claim, SMI argues that Sprengle failed to plead facts that plausibly show his termination was substantially motivated by his personal injury action. Id. at 5–9. Finally, as to the Maintenance and Cure Claim, SMI argues that it had no duty to

provide additional psychological treatment in November 2021 because Sprengle was beyond the point of maximum cure. Id. at 10-14. The Court addresses these arguments in turn and concludes that they have no merit.

## II. Legal Standard

In ruling on a motion to dismiss brought pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); Swierkiewicz v. Sorema N.A., 534 U.S. 506, 508, n.1 (2002); see also Lotierzo v. Woman's World Med. Ctr., Inc., 278 F.3d 1180, 1182 (11th Cir. 2002).   In addition, all reasonable inferences should be drawn in favor of the plaintiff.   See Randall v. Scott, 610 F.3d 701, 705 (11th Cir. 2010).   Nonetheless, the plaintiff must still meet some minimal pleading requirements.   Jackson v. BellSouth Telecomm., 372 F.3d 1250, 1262–63 (11th Cir. 2004) (citations omitted).   Indeed, while "[s]pecific facts are not necessary," the complaint should "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"   Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).   Further, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."   Twombly, 550 U.S. at 570.   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).

A "plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations omitted); see also Jackson, 372 F.3d at 1262 (explaining that "conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal" (citations and quotations omitted)). Indeed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," which simply "are not entitled to [an] assumption of truth." Iqbal, 556 U.S. at 678-79. Thus, in ruling on a motion to dismiss, the Court must determine whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. at 678 (quoting Twombly, 550 U.S. at 570).

## III.   Discussion

### A. Count IV: The Unseaworthiness Claim

Vessel owners have an absolute duty to furnish a seaworthy vessel. Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 549–50 (1960).[3] This duty

---

[3] There is no dispute that Sprengle is a "seaman" eligible to bring an

extends not only to the vessel itself, but also to equipment appurtenant to the ship. Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 427 (1959) (citations omitted). A vessel owner breaches its absolute duty when it provides a vessel that is not reasonably fit for its intended purpose. Mitchell, 362 U.S. at 550.

In Count IV, Sprengle alleges that the Elsbeth II was unseaworthy because its equipment—the pickup line—was not reasonably fit for its intended use. See Third Amended Compl. ¶ 55. SMI disagrees and offers two reasons why Count IV should be dismissed. See Motion at 3–5. First, SMI argues that its duty to provide a seaworthy vessel did not extend to the pickup line. Id. at 4–5. Second, SMI argues that it could not anticipate the way the pickup line was used. Id. at 3. Neither argument is persuasive.

### 1) SMI's Duty to Provide a Seaworthy Vessel Extended to the Pickup Line

The duty of seaworthiness extends to all equipment appurtenant to the vessel. Mahnich v. S. S. Co., 321 U.S. 96, 99, 103 (1944). Equipment is appurtenant to the vessel when (1) the equipment is physically and firmly attached to the vessel; (2) the equipment is fundamentally related to the

---

unseaworthiness claim. See Ross v. Mobile Oil Corp., 474 F.2d 989, 990 (5th Cir. 1973) (holding that the doctrine of seaworthiness does not afford a basis for recovery to those who fail to establish their status as a "seaman").

vessel's maritime activities; and (3) the injury occurs aboard the ship. Drachenberg v. Canal Barge Co., 571 F.2d 912, 920 (5th Cir. 1978).[4] Physical attachment need not be permanent or substantial; when the injury occurs aboard the ship, temporary minimal attachment is enough to give rise to a duty. Id. at 921.

Here, Sprengle has adequately alleged that the pickup line was appurtenant to the Elsbeth II. He assets that the line was physically and firmly attached to the ship because it was wrapped around the cathead with enough tension to lift the pennant chain. See Third Amended Compl. ¶¶ 16, 20–21. His factual statements also plausibly allege that the pickup line was fundamentally related to the Elsbeth II's maritime mission—to transport the BOA Barge to Colombia—because it was necessary to attach the tugboat with the barge. Finally, Sprengle asserts that his injury occurred aboard the ship because he was spooling the pickup line around the cathead when the line parted. Taken together, these allegations suffice to plausibly allege that the pickup line was appurtenant to the Elsbeth II.

SMI's argument to the contrary is unavailing. SMI says that it had no duty to provide a seaworthy pickup line because BOA owned and supplied the

---

[4] Fifth Circuit decisions handed down prior to October 1, 1981, are binding precedent upon this Court. Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

line. See Motion at 4–5. But the duty of seaworthiness extends to equipment temporarily brought aboard by others. Alaska Steamship Co. v. Petterson, 347 U.S. 396, 396 (1954); T. J. Stevenson & Co. v. George W. Whiteman Towing, Inc., 331 F. Supp. 1038, 1042 (E.D. La. 1970).[5] In Stevenson, a tugboat crew threw a rope to the open deck of another boat so the boat's crew could use the rope to pull aboard the tugboat's cable. Stevenson, 331 F. Supp. at 1040. While the boat's crew pulled the rope, it broke. Id. The court held that the rope constituted equipment appurtenant to the boat, even though it was supplied by the tugboat's crew, explaining that "[a] vessel can be rendered seaworthy by equipment of others." Id. at 1042–43 (citing Alaska Steamship, 347 U.S. at 396). Like the shipowner in Stevenson—who warranted the seaworthiness of a rope owned and supplied by a different crew—Sprengle has plausibly alleged that SMI warranted the seaworthiness of the pickup line, even though it was owned and supplied by the BOA Crew such that the duty of seaworthiness applied to the pickup line.

---

[5] The Court notes that although decisions of other district courts are not binding, they may be cited as persuasive authority. See Stone v. First Union Corp., 371 F.3d 1305, 1310 (11th Cir. 2004) (noting that, "[a]lthough a district court would not be bound to follow any other district court's determination, the decision would have significant persuasive effects").

## 2) The Pickup Line was not Reasonably Fit for its Intended Purpose

A vessel is unseaworthy when its equipment is defective. Waldron v. Moore-McCormack Lines, Inc., 386 U.S. 724, 726 (1967). Equipment is defective when it is not reasonably fit for its intended purpose.[6] Marshall v. Ove Skou Rederi A/S, 378 F.2d 193, 196 (5th Cir. 1967). To determine whether equipment is reasonably fit, the court should consider the equipment's purpose; the hazards, perils, and forces the equipment will likely face; and the ability of the equipment to withstand those anticipated forces. Id. at 196–97. If a vessel owner can reasonably anticipate that equipment will be used in a certain manner, the owner warrants that the equipment is fit to meet all foreseeable hazards that accompany such use. Id. at 196–198, n.6; Parker v. S/S Dorothe Olendorff, 483 F.2d 375, 379–80 (5th Cir. 1973) (stating that the intended purpose of the equipment establishes the legal standard by which the strength of the equipment is to be judged). If the equipment fails during that

---

[6] A vessel owner's duty to furnish a seaworthy ship is absolute, and it exists independent from the duty to exercise reasonable care. E.g., Mitchell, 362 U.S. at 549. Liability of a vessel owner, therefore, does not rest upon concepts of fault or negligence. Id. If an unseaworthy condition exists, no amount of care, prudence, or diligence will absolve the owner. Churchwell v. Bluegrass Marine, Inc., 444 F.3d 898, 904 (6th Cir. 2006) ("A ship owner is strictly liable for personal injuries caused by his or her vessel's unseaworthiness."). Nevertheless, in determining the threshold question of whether an unseaworthy condition exists, courts look to whether the equipment is "reasonably fit" for its intended purpose. Mitchell, 362 U.S. at 549. This threshold inquiry concerns foreseeability, and it necessarily requires the language of negligence. Marshall v. Ove Skou Rederi A/S, 378 F.2d 193, 198 n.6 (5th Cir. 1967).

anticipated use, it is unseaworthy. <u>Vega v. The Malula</u>, 291 F.2d 415, 420 (5th Cir. 1961) ("[T]he failure of the [equipment] under normal expected use visits on the vessel owner an unremitting liability based on a breach of the absolute duty.").

Seeking dismissal of Sprengle's Unseaworthiness Claim, SMI argues that it could not reasonably anticipate the way the pickup line was used. <u>See</u> Motion at 4. According to SMI, the pickup line was only meant to pull the "chain pigtail"[7]—not the pennant and bridle chains. <u>Id.</u> at 3–4. This fact, SMI says, was communicated to Captain Smith by BOA crew members the day before the incident, after the captain raised concerns about the pickup line's size. <u>Id.</u> at 3. SMI argues that BOA crew members misused the line when they allowed it to pull the pennant and bridle chains, not just the chain pigtail. <u>Id.</u> at 4. According to SMI, it could not anticipate this misuse; therefore, the pickup line was not defective as a matter of law. <u>Id.</u> at 3–4. The Court disagrees.

From the facts alleged in the Third Amended Complaint, it is plausible that SMI could foresee the pickup line being used to pull the pennant and bridle chains. Indeed, the <u>Elsbeth II</u> crew initially rejected the pickup line as

---

[7] The precise meaning of the term "chain pigtail" is unclear to the Court. For purposes of this Motion, the Court assumes that the term refers to a piece of equipment—whether connected to or part of the pennant chain—that weighs less than the pennant chain and is capable of facilitating the connection of the pennant chain and towline.

too weak for the job, suggesting that they knew it would be used to pull the heavier pennant and bridle chains. <u>See</u> Third Amended Compl. ¶¶ 18–19. Captain Smith also operated the turning cathead that lifted the chains—a process that he says was made more difficult because "the bridle chains were in the mud." <u>Id.</u> ¶ 23. Again, this statement plausibly suggests that Captain Smith was aware that the pickup line was pulling more than just the chain pigtail. Moreover, the allegations in the Third Amended Complaint also suggest that it may be customary for crews to use a pickup line to maneuver and lift pennant and bridle chains. <u>Parker</u>, 483 F.2d at 379 (relying on testimony regarding "long standing custom" as evidence that the owner could reasonably foresee the way equipment would be used); <u>Avena v. Clauss & Co.</u>, 504 F.2d 469, 471-72 (2d Cir. 1974) (recognizing that evidence of custom "certainly has some probative value" to the equipment's intended use). Indeed, during his inspection of the pickup line, Captain Smith assumed that it would be used to lift the pennant and bridle chains. <u>See</u> Third Amended Compl. ¶ 23 (stating that Captain Smith "called attention to the small size of the pickup line <u>for the bridles</u>") (emphasis added). And when <u>Elsbeth II</u> crew members objected to the pickup line's size, BOA crew members insisted that the pickup line was "the one we use all the time." <u>Id.</u> ¶ 23. Ultimately, the question— whether SMI should have anticipated that the pickup line would be used to

pull the pennant and bridle chains—is one of fact. <u>Mahnich</u>, 321 U.S. at 98 ("A finding of seaworthiness is usually a finding of fact."); <u>Johnson v. Bryant</u>, 671 F.2d 1276, 1279 (11th Cir. 1982) (stating that "[t]he question of seaworthiness is ordinarily one for the jury," and "only in a rare case can a vessel be unseaworthy as a matter of law") (citations omitted). And, given the facts alleged by Sprengle, the Court cannot declare the pickup line seaworthy as a matter of law.

But even assuming that the pickup line was unforeseeably misused and otherwise seaworthy, dismissal of Count IV is still not warranted. That is because Sprengle has plausibly alleged that the <u>Elsbeth II</u> crew—by misusing the pickup line in an unsafe manner—created a dangerous condition independent from the line's inherent fitness. And, an unseaworthy condition arises when crew members dangerously misuse equipment that is otherwise seaworthy. <u>Waldron</u>, 386 U.S. at 727 ("[E]ven though the equipment furnished for the particular task is itself safe and sufficient, its misuse by the crew renders the vessel unseaworthy." (citing <u>Crumady</u>, 358 U.S. at 427)); <u>Allen v. Seacoast Prod., Inc.</u>, 623 F.2d 355, 360-61 (5th Cir. 1980) ("It is established beyond question that misuse of even non-defective, otherwise seaworthy equipment may nevertheless create an unseaworthy condition."), <u>overruled on other grounds by</u> <u>Gautreaux v. Scurlock Marine, Inc.</u>, 107 F.3d 331, 339 (5th

Cir. 1997).[8] Indeed, courts have repeatedly found vessels unseaworthy when crew members intentionally tax equipment beyond its load capacity. <u>Crumady</u>, 358 U.S. at 427–28; <u>Varlack v. Mitsui O.S.K. Lines, K.K.</u>, 333 F. Supp. 1233, 1236 (E.D. Pa. 1971).

For example, in <u>Crumady</u>, the plaintiff used a rigging system to lift cargo from a ship. <u>Crumady</u>, 358 U.S. at 424–25. The system's winch had a safety device—a circuit breaker—that automatically shut the system down upon reaching three tons of stress. <u>Id.</u> at 425. Crew members readjusted the circuit breaker to allow six tons of stress. <u>Id.</u> While lifting six tons of cargo, the rigging system broke and fell atop the plaintiff. <u>Id.</u> at 424-26. The Supreme Court held that the vessel was unseaworthy. <u>Id.</u> at 427-28. In doing so, the Court recognized that the winch was not inherently defective; nevertheless, the winch's safety device "was adjusted by those acting for the vessel owner in a way that made it unsafe and dangerous for the work at hand." <u>Id.</u> According to the Court, this was "no different in principle from loading or unloading cargo with cable or rope lacking the test strength for the weight of the freight to be moved." <u>Id.</u> 427–28. In both situations, crew members misuse the equipment

---

[8] Along similar lines, an unseaworthy condition also can arise when crew members utilize an unsafe method of work. <u>Baker v. S/S Cristobal</u>, 488 F.2d 331, 332 (5th Cir. 1974) ("It is well settled that an improper method of handling cargo employed by a stevedore can create an unseaworthy condition." (citing <u>Morales v. City of Galveston, Tex.</u>, 370 U.S. 165, 170 (1962))).

by forcing it to exceed its load capacity, rendering the vessel pro tanto unseaworthy. Id. at 428.

Applying the principles from Crumady, the court in Varlack v. Mitsui O.S.K. Lines, K.K., 333 F. Supp. 1233, 1236 (E.D. Pa. 1971) found equipment unseaworthy on facts similar to those set forth in the Third Amended Complaint. There, a foreman asked a cargo-loading team to lift a forklift aboard the ship. Varlack, 333 F. Supp. at 1234. The forklift's weight exceeded the safety rating of a wire on the rigging system; therefore, the team objected to the request. Id. at 1234–35. However, on the foreman's insistence, the team obliged. Id. at 1234. When the team lifted the forklift, the wire snapped, injuring the plaintiff. Id. The vessel owner argued that the wire was seaworthy, despite its failure, because it was only intended to lift weight within its safety rating. Id. at 1235. The court disagreed. Citing Crumady, the court stated that "[a] ship whose equipment is perfectly operable under certain circumstances may be pro tanto unseaworthy if that equipment is adjusted or used in a manner which is unsafe for the work at hand." Id. By using the rigging system to lift an object that exceeded the wire's test strength, the team created an unsafe condition that rendered the vessel unseaworthy. Id. at 1236.

Here, Sprengle plausibly alleged that crew members of the Elsbeth II created a dangerous condition when they misused the pickup line by taxing it

beyond its load limit. Indeed, according to Sprengle, the first mate acknowledged that the pickup line was too worn, frayed, and thin for the job. See Third Amended Compl. ¶ 18. Nonetheless, like the crews in Crumady and Varlack—both of whom created a dangerous condition when they used equipment to lift cargo that exceeded its load capacity—Sprengle has plausibly alleged that the Elsbeth II crew created a dangerous condition when they used the pickup line to haul chains that exceeded its load limit rendering the Elsbeth II unseaworthy. Accordingly, Sprengle has stated a plausible claim for unseaworthiness.[9]

### B. Count V: The Retaliatory Discharge Claim

Next is Sprengle's Retaliatory Discharge Claim. See Third Amended Compl. ¶¶ 58–61. A claim for retaliatory discharge lies when a seaman is fired by his employer in retaliation for the seaman bringing a personal injury action against the employer. Smith v. Atlas Off-Shore Boat Serv., Inc., 653 F.2d 1057, 1063-64 (5th Cir. 1981). To prove retaliation, the seaman must affirmatively establish that the employer's decision was substantially motivated by

---

[9] SMI also suggests that dismissal of this claim is warranted because the BOA crew members who rigged the pickup line were the exclusive cause of the dangerous condition. See Motion at 3. But even if true, that does not bar a claim for unseaworthiness. See Grigsby v. Coastal Marine Serv. of Tex., Inc., 412 F.2d 1011, 1032 (5th Cir. 1969) (finding the vessel unseaworthy even though the dangerous condition was caused by an independent contractor aboard the ship) (citing Alaska Steamship, 347 U.S. at 396).

knowledge that the seaman either intends to, or already has, filed a personal injury action against the employer. Id.

SMI asks the Court to dismiss the Retaliatory Discharge Claim for two reasons, both of which are unavailing. First, SMI argues that Sprengle failed to allege sufficient facts to show he was terminated. See Motion at 5–6. But Sprengle alleges that "[o]n or around November 30, 2020, Smith Maritime terminated Plaintiff's Employment." See Third Amended Compl. ¶ 59. At this stage of the litigation, the Court must take this factual allegation as true. Second, SMI argues that Sprengle failed to allege facts showing that SMI's motivation for terminating him was his personal injury action. See Motion at 7–9. But in the Third Amended Complaint, Sprengle quotes a letter predating his termination where SMI's former counsel wrote that Sprengle's ability to return to work was directly conditioned on him abandoning his personal injury claim:

> Smith Maritime has had a very good relationship with Sprengle. He is considered a hard worker and was considered a valued employee. In fact, if there was no claim and the plaintiff was released to return to work, Smith Maritime would hire him in a second. However, unless [Plaintiff] would agree to drop his claim against Smith Maritime, the chances of his return to employment for Smith Maritime is nil.

See Third Amended Compl. ¶ 28. Sprengle did not drop his personal injury suit, and, according to him, he was terminated nearly two months later. Id. ¶

59. These facts, taken as true, plausibly show that Sprengle's termination was substantially motivated by his personal injury suit. Sprengle has stated a claim for retaliatory discharge.[10]

### C. Count VI: The Maintenance and Cure Claim

Last is Sprengle's Maintenance and Cure Claim. When the pickup line parted and struck Sprengle, it caused immediate physical injuries. <u>See</u> Third Amended Compl. ¶¶ 22, 65. More than a year later, in March 2020, a doctor also diagnosed him with psychological injuries. <u>Id.</u> ¶ 29. SMI authorized medications and psychological treatment for Sprengle's injuries. <u>Id.</u> However, after Sprengle continued to suffer from night terrors, he sought additional psychological treatment in November 2021. <u>Id.</u> ¶¶ 29, 66. This time, SMI refused his request. <u>Id.</u> This refusal, according to Sprengle, was a breach of SMI's obligation to provide maintenance and cure. <u>Id.</u> ¶¶ 66–67.

Shipowners must pay "maintenance and cure" to seamen who fall ill or are injured while in service of the ship. <u>Jauch v. Nautical Servs., Inc.</u>, 470 F.3d 207, 212 (5th Cir. 2006) (citation omitted). "Maintenance" is the right of the

---

[10] SMI urges the Court not to consider the letter because it contains hearsay. <u>See</u> Motion at 6–7. But even if true, there is no rule against hearsay statements in the pleadings. <u>Marquette v. HomeAdvisor, Inc.</u>, No. 6:20-cv1490-ORL31EJK, 2021 WL 2942742, at *2 n.3 (M.D. Fla. Jan. 15, 2021); <u>Muzaffarr v. Ross Dress for Less, Inc.</u>, No. 12-61996-CIV, 2013 WL 1890274, at *2 (S.D. Fla. May 7, 2013).

seaman to a daily stipend for living expenses, whereas "cure" is the right to necessary medical expenses. Jackson v. NCL Am., LLC, No. 19-25115-CIV, 2020 WL 6049684, at *4 (S.D. Fla. May 14, 2020), report and recommendation adopted, No. 19-25115-CIV, 2020 WL 6047485 (S.D. Fla. Oct. 13, 2020) (citation and quotation marks omitted). The right to maintenance and cure springs from the seaman's dependence on the ship; it does not turn on principles of negligence, causation, or seaworthiness. Costa Crociere, S.p.A. v. Rose, 939 F. Supp. 1538, 1548 (S.D. Fla. 1996). However, the right is not open ended. Rather, a shipowner's obligation to provide maintenance and cure ends at the point of "maximum medical improvement" (MMI). Belcher Towing Co. v. Howard, 638 F. Supp. 242, 243 (S.D. Fla. 1986) (citation omitted). A seaman reaches MMI when it is not reasonably possible that future medical treatment will result in the betterment of the seaman's condition. Id. (citing Vella v. Ford Motor Co., 421 U.S. 1, 6 n.5 (1974)); see also Pelotto v. L & N Towing Co., 604 F.2d 396, 400 (5th Cir. 1979).

Seeking dismissal of Sprengle's Maintenance and Cure Claim, SMI argues that it had no duty to provide additional treatment requested in November 2021 because Sprengle reached MMI in June 2020. See Motion at 10. SMI's argument rests on three sets of medical records authored by Doctor James Lance. Id. at 10–11. In the first set of records—dated June 16, 2020—

Doctor Lance appears to place Sprengle at MMI. (Doc. 49-1 at 7) ("MMI is assigned as of the evaluation date today, 06/16/2020."). In the second and third sets of medical records—dated September 14, 2020 and September 1, 2021—Doctor Lance repeats his conclusion that MMI was assigned on June 16, 2020. Id at 15, 21 ("MMI was assigned on 06/16/2020."). SMI points to these written statements as proof that Sprengle reached MMI in June 2020. See Motion at 10, 12.

The medical records were not part of Sprengle's Complaint, nor were they attached as exhibits. See generally Third Amended Compl. Therefore, as a general rule, the Court may not consider the documents at the motion-to-dismiss stage without converting the motion to one for summary judgment. See Fed. R. Civ. P. 12(d); Bickley v. Caremark RX, Inc., 461 F.3d 1325, 1329 n.7 (11th Cir. 2006). However, there are two relevant exceptions that allow the court to consider evidence extrinsic to the pleadings without converting the motion to one for summary judgment. First, courts may consider documents that are incorporated by reference into the complaint. Brooks v. Blue Cross & Blue Shield, 116 F.3d 1364, 1369 (11th Cir. 1997). Second, courts may consider judicially noticed documents. Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1276-79 (11th Cir. 1999). SMI believes that Sprengle's medical records fall within both exceptions. See Motion at 10–12. The Court disagrees.

### 1) The Medical Records are not Incorporated by Reference into the Third Amended Complaint

Under the incorporation by reference doctrine, "[c]ourts may consider evidence extrinsic to the pleadings on a Rule 12(b)(6) motion to dismiss if (1) the documents are referred to in the complaint; (2) the evidence is central to the plaintiff's claim; and (3) the evidence's authenticity is not in question." U.S. ex rel. Saldivar v. Fresenius Med. Care Holdings, Inc., 906 F. Supp. 2d 1264, 1271 (N.D. Ga. 2012) (citing SFM Holdings, Ltd. v. Banc of America Sec., L.L.C., 600 F.3d 1334, 1337 (11th Cir. 2010); Brooks, 116 F.3d at 1368–69). The doctrine is inapplicable when the plaintiff neither references nor relies upon the extrinsic document in the complaint. Wilchombe v. TeeVee Toons, Inc., 555 F.3d 949, 959 (11th Cir. 2009) ("Because Wilchcombe did not reference these contracts in his amended complaint or attach them thereto, the district court properly refused to consider such contracts in ruling on the motion to dismiss."); Quinette v. Reed, 805 F. App'x 696, 700 (11th Cir. 2020) (stating that the contents of the document must be alleged in the complaint). Nor does it apply unless the documents are so central to the claim that they serve as a basis for the complaint, such that the plaintiff must have been aware of their existence. Adamson v. Poorter, No. 06-15941, 2007 WL 2900576, at *2 (11th Cir. Oct. 4, 2007).

Here, Sprengle did not attach the medical records to his Third Amended Complaint. Nor has SMI identified where he referenced or relied upon the records, or how they are central to the maintenance and cure claim in Count VI.[11] As a result, SMI failed to demonstrate that the medical records were incorporated by reference.

### 2) The Court Cannot Take Judicial Notice of the Medical Records for the Purpose of Finding Sprengle at MMI

In ruling on a motion to dismiss, the court may consider matters capable of judicial notice. U.S. ex rel. Osheroff v. Humana Inc., 776 F.3d 805, 811 (11th Cir. 2015) (citing Bryant, 187 F.3d at 1278). SMI argues that the medical records are public records because SMI previously filed them with this Court as an exhibit to a response in a prior discovery dispute. See Motion at 10–13. Because, in SMI's view, the medical records are now public records, the Court may judicially notice the medical records for the purpose of finding that Sprengle was at MMI in June 2020. Id. The Court disagrees.

---

[11] SMI dwells on the fact that it referenced and attached the records to a response it filed during an earlier discovery dispute. See Motion at 10–11. But that is irrelevant to determining whether the documents were incorporated by reference into the Third Amended Complaint. Adamson, 2007 WL 2900576, at *3 (stating that a document is not "central" merely because it is directly responsive to a factual allegation, but only when the plaintiff files a complaint based on a document that should have, in fairness, been attached to the complaint).

Rule 201(b) of the Federal Rules of Evidence allows a court to take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). Under this rule, court filings are public records whose existence is not subject to reasonable dispute. Universal Express, Inc. v. U.S. S.E.C., 177 F. App'x 52, 53–54 (11th Cir. 2006). Therefore, at the motion-to-dismiss stage, courts may consider documents filed in a prior court case. Id.[12]  Notably, however, courts may not take judicial notice of court records for the truth of the matters asserted in those records. E.g., United States v. Jones, 29 F.3d 1549, 1553 (11th Cir. 1994); Legacy Ent. Grp., LLC v. Endemol USA Inc., No. 3:15-CV-0252-HES-PDB, 2015 WL 12838795, at *4 (M.D. Fla. Oct. 1, 2015); In re Takata Airbag Products Liab. Litig., 396 F. Supp. 3d 1101, 1129 (S.D. Fla. 2019). Instead, courts may only take judicial notice of court records for the limited purpose of establishing the fact of such litigation, the record's existence, and the record's content. See Bryant, 187 F.3d at 1277–78; Beepot v. J.P. Morgan Chase Nat. Corp. Servs., Inc., 57 F. Supp. 3d 1358, 1366 (M.D. Fla. 2014) (citing Jones, 29 F.3d at 1553); MB Plaza, LLC

---

[12] SMI does not rely upon documents filed in a prior case, but documents it previously filed in the current case. The Court need not decide whether such documents constitute public records capable of judicial notice because even if they do, it does not affect the Court's conclusion.

v. Wells Fargo Bank, NA, No. 10-24241-CIV, 2011 WL 3703143, at *1 (S.D. Fla. Aug. 23, 2011).

Here, SMI asks the Court to judicially notice the medical records for the truth of their content. Specifically, SMI relies upon an assertion by Doctor Lance—"MMI is assigned as of evaluation today, 06/16/2020"—to establish that Sprengle was, in fact, at MMI in June 2020. The Court cannot take judicial notice of the medical records for the truth of this factual statement. "To do so would bypass the safeguards which are involved with the usual process of proving facts by competent evidence in district courts.[13] Takata, 396 F. Supp. 3d at 1128. The Motion as to Count VI is due to be denied.

## IV.   Conclusion

For the foregoing reasons, SMI's Motion is due to be denied.

Accordingly, it is

**ORDERED:**

---

[13] Because the Court chooses not to consider the extrinsic documents, the Motion will not be converted into one for summary judgment under Rule 56, Federal Rules of Civil Procedure.

Defendant Smith Maritime Inc.'s Motion to Dismiss Counts IV, V, and VI of the Third Amended Complaint (Doc. 64) is **DENIED.**

**DONE** and **ORDERED** in Jacksonville, Florida this 3rd day of March, 2023.

**MARCIA MORALES HOWARD**
United States District Judge

Copies furnished to:

Counsel of Record